UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* )<br>JODIE MURRILL, Personal Representative )<br>of the Estate of GARY MURRILL, )<br>)<br>         Plaintiff, )<br>)<br>        v. )<br>)<br>ELN Enterprises, LLC, )<br>)<br>         Defendant. ) | EXHIBIT A<br><br>Case No. 4:21-cv-00371-DGK |

**FIRST AMENDED COMPLAINT**

COMES NOW the Plaintiff United States of America, by and through Relator Jodie Murrill, Personal Representative of the Estate of Gary Murrill. For her Complaint against ELN Enterprises, LLC (ELN), pursuant to the provisions of 31 U.S.C. §§ 3729, 3730, 3731 and 3732, alleges and states as follows:

**INTRODUCTION**

1. This is an action to recover damages and civil penalties on behalf of the United States of America (Government) arising from false statements and claims made or caused to be made by Defendant to the Government in violation of the False Claims Act, 31 U.S.C. §§ 3729, et seq. (FCA).

2. Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the Government's ability to recover losses sustained due to fraud against the United States of America.

3. The FCA provides that any person who knowingly presents, or causes to be presented to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty

ranging from $11,665 to $23,331 for each such claim, and three times the amount of the damages sustained by the Government. Attorney fees may also be awarded.

## THE PARTIES

4.      Relator is the Personal Representative of the Estate of Gary Murrill and is authorized to bring these causes of action individually and on behalf of the Estate. Relator is a resident and citizen of the State of Missouri. A copy of Letters of Administration in the Estate of Gary Murrill, Deceased, Estate No. 21 CY PR 00439, issued by the Circuit Court of Clay County, Missouri, Probate Division, appointing Jodie Murrill as the Personal Representative is attached as Exhibit A.

5.      Defendant ELN Enterprises, LLC is a Nevada limited liability company.

## JURISDICTION AND VENUE

6.      Relator brings this action pursuant to 31 U.S.C. §§ 3729, 3730, 3731 and 3732.

7.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 for actions arising under federal law.

8.       Venue lies in this District under 29 U.S.C. § 1132(e)(2), as the false claims were made in this district.

9.       Venue is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to this action occurred within this judicial district.

## NATURE OF THE ACTION

10.     Over at least six years, Defendant, as an agency paid by the Social Security Administration for Consultative Examinations (CEs), has engaged in a deliberate pattern and practice designed to obtain payment from the Government through its Social Security programs by knowingly submitting false and fraudulent Consultative Examination Reports, knowingly

misrepresenting information it allegedly obtained through its Consultative Examinations of Social Security claimants, knowingly providing information about Social Security claimants to the Government that it knew was false and incorrect, and in other respects more particularly claimed below and which may arise through discovery. This fraud has resulted, and continues to result, in monetary damages to the Government.

11. Relator asserts causes of action under the FCA for Defendant's submission of knowingly false or fraudulent claims for payment or approval, and submission of knowingly false records to get a false or fraudulent claim approved, in violation of 31 U.S.C. § 3729(a)(1) and (2). She is entitled under 31 U.S.C. § 3730(b)(1) to bring this private cause of action for herself, the Estate, and for the Government.

## SOCIAL SECURITY DISABILITY INCOME

12. The Social Security Disability Insurance (SSDI) program was established in 1954 under title II of the Social Security Act, 42 U.S.C. 401, et seq. The program provides benefits to disabled wage earners and their families.

13. SSDI is administered by the Social Security Administration (SSA).

14. Individuals seeking to obtain SSDI benefits must be severely disabled. To be considered disabled under the Social Security Administration's definition of disability, a claimant must "have a medically determinable physical or mental impairment that has lasted or is expected to last at least twelve months or result in death and that prevents him/her from performing any substantial gainful activity." Substantial gainful activity is defined as work resulting in earnings of at least $1,310.00 per month or equivalent activity.

15. Even if a person meets Social Security's stringent definition of disability, Social Security will not begin paying benefits until the person is disabled for more than five months.

16. The application process for obtaining Social Security disability benefits typically takes many months.

17. To apply for SSDI benefits, the claimant completes an application, known as Form SSA-3368-BK, and files it with a local Social Security Field Office.

18. The first step in the SSDI claim process is the initial consideration. During this step, the SSA determines if the claimant meets the non-medical eligibility requirements and the medical eligibility requirements.

19. The SSDI Application is received by the SSA's Field Office, at which point a claims representative establishes a disability folder, compiling the non-medical and preliminary medical information associated with the application.

20. The claims representative then immediately determines whether the claimant satisfies the non-medical eligibility for SSDI, i.e., whether the claimant has paid enough taxes on their wages to be insured for SSDI benefits. If not, the claim is denied.

21. If the claimant meets the non-medical eligibility requirements, then the folder is shipped to a state Disability Determination Service (DDS) center to determine whether the claimant meets the medical eligibility requirements.

22. In the state DDS, a team composed of a disability examiner and a physician, and a psychologist makes the disability determination based on an evidentiary record.

23. The evidentiary record includes medical evidence of record (MER), which the DDS obtains from the claimant's treating physicians. MER includes copies of medical records, laboratory reports, prescriptions, x-rays, ancillary tests, operative and pathology reports, Consultative Examination Reports and other technical information.

24. DDSs are required to make every reasonable effort to obtain MER from the claimants' treating sources. SSA's instructions define every reasonable effort as: (1) making an initial request for MER from the treating source; (2) making a follow-up request any time between 10 and 20 calendar days after the initial request if the MER has not been received; and (3) allowing a minimum of 10 calendar days from the follow-up request for the treating source to respond. However, if MER is not received within ten calendar days from the follow-up request the DDS can purchase a Consultative Examination.

## THE ROLE OF CONSULTATIVE EXAMINATION IN THE SOCIAL SECURITY CLAIMS PROCESS

25. A Consultative Examination (CE) is a physical or mental health examination or test purchased on behalf of a claimant at the SSA's expense and is requested by the agency to make a disability determination.

26. The state DDSs, which are federally-funded state agencies that support SSA in making disability determinations, manage the process of ordering and paying for CEs.

27. The DDS obtains permission from the claimant to requisition medical evidence directly from the claimant's treating source.

28. The DDS can also order a CE from a CE provider, which can be the claimant's treating source or another medical provider, if necessary, to obtain additional information to make a disability decision.

29. The information included in a CE is part of the evidence used to assess eligibility for benefits.

30. The Code of Federal Regulations (CFR) and the "Consultative Examinations: A Guide for Health Professionals," referred to by the SSA as the *Green Book*, provide detailed guidelines on CE processes, content, and completeness. CFR § 404.1519n sets forth the regulations

applicable to CEs in the context of SSDI claims. These regulations include guidelines regarding the necessary elements of a CE:

> (c) *Elements of a complete consultative examination.* A complete consultative examination is one which involves all the elements of a standard examination in the applicable medical specialty. When the report of a complete consultative examination is involved, the report should include the following elements:
>
> (1) Your major or chief complaint(s);
>
> (2) A detailed description, within the area of specialty of the examination, of the history of your major complaint(s);
>
> (3) A description, and disposition, of pertinent "positive" and "negative" detailed findings based on the history, examination and laboratory tests related to the major complaint(s), and any other abnormalities or lack thereof reported or found during examination or laboratory testing;
>
> (4) The results of laboratory and other tests (e.g., X-rays) performed according to the requirements stated in the Listing of Impairments (see appendix 1 of this subpart P);
>
> (5) The diagnosis and prognosis for your impairment(s);
>
> (6) *A medical opinion.* Although we will ordinarily request a medical opinion as part of the consultative examination process, the absence of a medical opinion in a consultative examination report will not make the report incomplete. See § 404.1513(a)(3); and
>
> (7) In addition, the medical source will consider, and provide some explanation or comment on, your major complaint(s) and any other abnormalities found during the history and examination or reported from the laboratory tests. The history, examination, evaluation of laboratory test results, and the conclusions will represent the information provided by the medical source who signs the report.

31. CEs are also governed by the SSA's Program Operations Manual System, or POMS, which prescribes the processes and contents of a CE.

32. 20 CFR § 404.1519n(a) and POMS § DI 39542.235(3) set forth expectations regarding the proper and necessary length of particular examinations. For example, it instructs that the minimum scheduling interval for a comprehensive general medical examination is 30 minutes; 20 minutes for a comprehensive musculoskeletal or neurological examination; and 40 minutes for a comprehensive psychiatric examination.

33. The Government, through its administration of the SSDI program, incurs substantial administrative expenses investigating and adjudicating claims for SSDI benefits. For example, the DI Trust Fund, administered by the SSA, incurred over $2.6 billion in administrative expenses in 2019, the latest year statistics are available. These expenses include the cost of ordering and paying for CEs and subsequent reports.

**ELN Enterprises, LLC**

34. ELN Enterprises, LLC ("ELN") is a Nevada limited liability company.

35. ELN contracts with SSA, through state DDS services, to provide CEs of SSDI claimants.

6

Case 4:21-cv-00371-DCK   Document 53-1   Filed 01/30/24   Page 6 of 14
Case 4:21-cv-00371-DCK   Document 50   Filed 01/12/24   Page 6 of 14

36. In exchange for providing a CE, ELN receives payment from the Government. It does so by submitting an invoice, or claim, for payment from the Government. On information and belief, ELN has performed, invoiced and received payment from the Government for thousands of CEs during the last six years.

## FRAUDULENT EXAMINATIONS

37. Rather than fulfilling its obligation to provide truthful, accurate, and reliable CEs, ELN has, through the examiners it employs, engaged in a pattern and practice of submitting CE reports and invoices to the Government that are fraudulent, incomplete, misleading, and contain false information.

38. Relator is the widow of Gary Murrill. Before his death, Mr. Murrill was an SSDI claimant.

39. While his claim was pending, the SSA ordered a CE to be performed of Mr. Murrill.

40. The CE was scheduled through the Missouri DDS office "S80" in Jefferson City, Missouri.

41. Mr. Murrill was instructed to report to ELN's North Kansas City, Missouri examination facility on September 14, 2019, for an "Internist Examination and Report (physical examination)."

42. Mr. Murrill reported as instructed on September 14, 2019, and was accompanied by his wife, Jodie Murrill.

43. Mr. Murrill was seen by Jesal S. Amin, MD. At all relevant times, Dr. Amin was an employee and agent of ELN, and was acting within the scope and course of his employment and agency with ELN.

7

44. There were several other claimants in the waiting room of ELN's office when the Murrills arrived.

45. Other than by claimants, the ELN office was occupied by two persons: Dr. Amin and a female receptionist. Dr. Amin was the only medical professional present.

46. At the time of Mr. Murrill's appointment, Dr. Amin had been out of medical school for less than two years. He had not completed his residency requirement. He was not board certified in any field. He had no training in medical evaluations.

47. Dr. Amin's "examination" of Mr. Murrill lasted a total of fewer than five minutes from the time Dr. Amin entered the examination room to the time he left. At no time was Dr. Amin observed to be taking notes or making any written or electronic recordings of his examination with a computer, tablet, dictaphone, pen, pencil or other device.

48. Following the examination, Dr. Amin authored a report.

49. ELN submitted Dr. Amin's report to the Government along with an invoice.

50. ELN charged $185.96 for Dr. Amin's "examination" of Mr. Murrill and the generation of Dr. Amin's report, and was paid by the Government for the CE and report.

51. ELN's and Dr. Amin's report was fraudulent, incomplete, inadequate, misleading and contained false information. The CE upon which it was based was wholly inadequate, violated applicable federal regulations and POMS guidelines, and ran afoul of generally accepted standards and practices. The invoice and report is attached as Exhibit A.

52. In his report, Dr. Amin stated that:

> "I generally observed the claimant to be able to button and unbutton a shirt, pick up and grasp a pen and write a sentence and lift, carry and handle personal belongings."

53. Mr. Murrill arrived at his examination wearing a shirt with no buttons. At no time during the examination did Mr. Murrill remove any of his clothing, nor was he asked to do so by Dr.

8

Amin. Mr. Murrill was not presented with an opportunity to button or unbutton any article of clothing.

54. At no time during the examination did Mr. Murrill grasp a pen or write a sentence. At no time during the examination was he asked to do so by Dr. Amin.

55. At no time during the examination did Mr. Murrill lift, carry or handle any personal belongings. Mr. Murrill did not bring any personal belongings with him to the examination.

56. Dr. Amin's report falsely stated that he administered a visual acuity test. No such test was administered.

57. Dr. Amin's report falsely stated that he administered a Romberg test – a tool to diagnose sensory ataxia – whereby the subject removes his or her shoes and stands with arms held next to the body, with eyes closed.

58. Dr. Amin did not administer a Romberg test during the September 14, 2019 examination. At no time during the examination did Mr. Murrill remove his shoes. Nor was he ever asked to assume the posture and perform the acts the Romberg test requires.

59. Dr. Amin's report falsely stated that none of Mr. Murrill's joints were swollen or deformed. Mr. Murrill wore clothing that covered his entire body except for his hands, neck and head. He was never asked to remove any clothing at the examination, or pull up his sleeves or pants to reveal his joints, and did not do so.

60. Dr. Amin's report falsely stated that Mr. Murrill was able to squat and rise from that position. At no time during the examination did Mr. Murill squat.

61. Dr. Amin's report falsely stated that Mr. Murill was unable to hop on one foot. At no time during the examination was Mr. Murrill asked to hop on one foot.

9

Case 1:21-cv-00371-DCK Document 53-1 Filed 01/30/24 Page 9 of 14
Case 4:21-cv-00371-DCK Document 53-1 Filed 01/30/24 Page 9 of 14

62.     Dr. Amin's report falsely stated that Mr. Murrill was observed to dress and undress. At no time during the examination did Mr. Murrill remove any of his clothing.

**THE COST OF FRAUD**

63.     As a result of the conduct described above, the Government paid for a fraudulent and worthless CE and report. However, the cost of this fraud is not limited to the amount ELN charged for the examination and report. DDS incurred administrative costs in arranging for and scheduling the CE, processing the report and invoice from ELN, and reviewing the report. Similar administrative costs were repeated and incurred by SSA at each level when the report was considered, reviewed, or relied upon.

64.     Nor is the damage to the Government limited to the false claims made by ELN as a result of Dr. Amin's September 14, 2019 CE of Mr. Murrill. Over the last six years, ELN has made at least 39 separate false claims similar to the ones described above involving other SSDI claimants. Many also involve Dr. Amin. On information and belief, this fraudulent conduct was repeated in thousands of instances with thousands of other SSDI claimants over the last six years.

65.     Attached as Exhibit B is a list of former or current SSDI claimants (Exhibit Claimants) who underwent CEs performed by ELN and one of its examiners. Attached as Exhibit C are the false and fraudulent CE reports and invoices submitted to the Government seeking payment with respect to those claimants.

66.     Exhibits A, B and C demonstrate that ELN engaged in a pattern and practice of submitting false claims, in the form of fraudulent CE reports and invoices, to the Government for payment. One such pattern is the utilization of a template or form for every examinee, regardless

of the type of examination or the ailment of the claimant. For example, in each of the CE reports in Exhibit C, the examiner notes:

> "I generally observed the claimant to be able to button and unbutton a shirt, pick up and grasp a pen and write a sentence and lift, carry and handle personal belongings."

67. None of the Exhibit Claimants buttoned or unbuttoned a shirt, picked up and grasped a pen, wrote a sentence, or lifted during their examinations.

68. On information and belief, discovery will reveal that ELN engaged in similar if not identical practices involving thousands of other SSDI claimants (Discovery Claimants), resulting in the submission and payment of hundreds of thousands of dollars of invoices to the Government based on false claims.

69. Each time ELN submitted an invoice to the Government for the cost of a fraudulent and false CE, it committed an independent violation of the FSA and is subject to a civil penalty for each such violation under 31 U.S.C. § 3729(a).

## COUNT ONE – VIOLATION OF 31 U.S.C. § 3729(a) AS TO MURRILL REPORT

70. The preceding paragraphs of the Complaint are incorporated.

71. In preparing, submitting, and charging the Government for Dr. Amin's report following his September 14, 2019 examination of Mr. Murrill, ELN and Dr. Amin:

   a. knowingly, either through actual knowledge, deliberate ignorance, or reckless disregard, presented, or caused to be presented a false or fraudulent claim for payment to the Government;

   b. knowingly, either through actual knowledge, deliberate ignorance, or reckless disregard, made, used or caused to be made or used a false record or statement material to a false or fraudulent claim to the Government;

11

Case 4:21-cv-00371-DCK   Document 53-1   Filed 01/30/24   Page 11 of 14
Case 4:21-cv-00371-DCK   Document 53-1   Filed 01/30/24   Page 11 of 14

c. conspired to present or caused to be presented a false or fraudulent claim for payment to the Government; and

d. conspired to make, use or cause to be made or used a false record or statement material to a false or fraudulent claim for payment to the Government.

72. As a direct result of ELN's false claims, the Government sustained damage.

## COUNT TWO - VIOLATION OF 31 U.S.C. § 3729(a) AS TO EXHIBIT CLAIMANTS

73. The preceding paragraphs of the Complaint are incorporated.

74. In preparing, submitting, and charging the Government for the reports following the CEs of the Exhibit Claimants, ELN:

a. knowingly, either through actual knowledge, deliberate ignorance, or reckless disregard, presented, or caused to be presented a false or fraudulent claim for payment to the Government;

b. knowingly, either through actual knowledge, deliberate ignorance, or reckless disregard, made, used or caused to be made or used a false record or statement material to a false or fraudulent claim to the Government;

c. conspired to present or caused to be presented a false or fraudulent claim for payment to the Government; and

d. conspired to make, use or cause to be made or used a false record or statement material to a false or fraudulent claim for payment to the Government.

75. As a direct result of ELN's false claims, the Government sustained damage.

## COUNT THREE - VIOLATION OF 31 U.S.C. § 3729(a) AS TO DISCOVERY CLAIMANTS

76. In preparing, submitting, and charging the Government for the reports following the CEs of the Discovery Claimants, ELN:

a. knowingly, either through actual knowledge, deliberate ignorance, or reckless disregard, presented, or caused to be presented a false or fraudulent claim for payment to the Government;

b. knowingly, either through actual knowledge, deliberate ignorance, or reckless disregard, made, used or caused to be made or used a false record or statement material to a false or fraudulent claim to the Government;

c. conspired to present or caused to be presented a false or fraudulent claim for payment to the Government; and

d. conspired to make, use or cause to be made or used a false record or statement material to a false or fraudulent claim for payment to the Government.

77. As a direct result of ELN's false claims, the Government sustained damage.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against ELN Enterprises, LLC, in an amount equal to three times the amount of damages incurred by the Government, for the imposition of a civil penalty for each separate, independent false claim made by ELN Enterprises, LLC , for attorney fees, costs and expenses, and such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

BURNETTDRISKILL, ATTORNEYS

*/s/ Derrick A. Pearce*
Derrick A. Pearce MO #42793
Kyle H. Sciolaro MO #64568
Roger M. Driskill MO #24709
103 W. 26th Ave., Ste. 290
North Kansas City, MO 64116
P: 816.781.4836
F: 816.792.3634
dpearce@burnettdriskill.com
ksciolaro@burnettdriskill.com
rdriskill@burnettdriskill.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of January, 2024, a true and accurate copy of the above and foregoing was filed through the CM/ECF system, which provided notice to all counsel who have appeared in the action. In addition, a copy was emailed to counsel for Defendant at djermann@atllp.com.

*/s/ Derrick A. Pearce*
Derrick A. Pearce

14

Case 4:21-cv-00371-DGK   Document 531   Filed 01/30/24   Page 14 of 14